**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| ARLETTE CAMPOS, individually and on behalf of all others similar situated,<br><br>Plaintiff,<br><br>-vs-<br><br>TJX Companies, Inc.,<br><br>Defendant. | ) ) ) ) ) ) ) ) ) ) | **Case No. 1:24-cv-11067-ADB**<br><br>**MEMORANDUM IN SUPPORT OF DEFENDANT TJX COMPANIES, INC.'S MOTION TO DISMISS** |

## I. INTRODUCTION

This case involves email "pixel" technology, a commonplace technology that allows companies to know whether and when their emails are opened. Far from a nefarious surveillance scheme, pixels help ensure that emails reach their destinations, rather than ending up in spam folders, and thus allow marketers to tailor their communications to recipients' interests. Plaintiff Arlette Campos's square-peg/round-hole Complaint seeks to shoehorn this ubiquitous, no-injury practice into a violation of the Arizona Telephone, Utility and Communication Service Records Act, A.R.S. § 44-1376, *et seq.* ("**Arizona Act**"). Her ultimate aim is to extract significant classwide penalties never imagined by Arizona's legislature.

The Court should not indulge that gambit. Plaintiff asked to receive TJX's marketing emails. TJX obliged. But now, Plaintiff claims that by implementing pixel technology, TJX learned information like whether and when she opened TJX's emails, the Internet Protocol ("**IP**") address at which she did so, which email client (*e.g.*, Outlook) she used, and whether she forwarded or printed the emails (which she does not claim to have done). According to Plaintiff, this amounts to "sensitive information."

To dress up that incredible assertion as something worthy of concern, the Complaint compares pixel technology to Hewlett-Packard's 20-year-old surveillance scandal. But the email "spyware" story Plaintiff weaves was not the scandal there, nor does it have any relation to the Arizona Act as Plaintiff pretends. Plaintiff's claim fails for at least four reasons.

***First***, Plaintiff lacks Article III standing because she has suffered no injury-in-fact. Plaintiff alleges in conclusory fashion that using a pixel constitutes "intrusion upon seclusion," but alleges no harm beyond a statutory violation itself. Many courts have rejected the notion that the mere use of pixels or similar technologies can establish a concrete harm. This Court should do the same.

***Second***, Plaintiff's allegations, accepted as true, do not support a claim under the Arizona Act. The Arizona Act is intended to prevent "**pretexting**," a practice of impersonating a consumer to trick a utility into sharing the account holder's "public utility record, a telephone record or communication service record." *See* A.R.S. § 44-1376.01(A)(1). Plaintiff alleges no such thing. Instead, she claims that information concerning whether and when an email is opened is a "*communication service* record." That inventive claim misinterprets the statute's plain language, undermines its legislative purpose, and is inconsistent with related Arizona and federal laws. Plaintiff never alleges that TJX provided a communication service to Plaintiff.

***Third,*** Plaintiff's allegations fall short of a statutory violation for other reasons. The pixel logically could not have "procured" information that TJX necessarily had *before* sending the email, like Plaintiff's email address. Further, the statute does not regulate collecting information about a consumer's actions after receiving the email, like forwarding or printing it.

And ***fourth***, Plaintiff's theory proves too much. If the Arizona Act means what Plaintiff says it means, then *every email sent to Arizona residents* is unlawful. After all, the metadata of

every email records the type of information that Plaintiff contends may not be recorded, like (but not limited to) an IP address. In sum, Plaintiff asks the Court to expand a 17-year-old Arizona statute in a way no court has ever interpreted it, far beyond its terms and intended scope, and in a manner inconsistent and unparalleled with its related state and federal statutory schemes. The Court should decline Plaintiff's invitation and dismiss her Complaint with prejudice.

## II. BACKGROUND

### A. Plaintiff's Allegations

Plaintiff is an Arizona resident who alleges that she received emails from TJX regarding its Marshalls brand department store between September 2022 and March 2024. (Compl. ¶ 8.)

Plaintiff acknowledges that she "subscribe[d] to Defendant's email list" and chose to open the emails "to review promotional materials related to Marshalls." (*Id.* ¶¶ 3, 8.) She claims, however, that TJX uses pixel technology (which she calls "hidden spy pixel trackers") to record without her consent various information including "the email address, the subject of the email, when the email is opened and read, the recipient's location, how long the recipient spends reading an email, whether it is forwarded, whether it is printed, and what kind of email server the recipient uses, among other sensitive information." (*Id.* ¶ 35; *see also id.* ¶¶ 4, 52.) Although Plaintiff alleges that the pixel is a "grotesque" invasion of privacy and intruded upon her right to seclusion, she identifies no injury caused by the supposed intrusion. (*Id.* ¶¶ 31, 54.)

Plaintiff's sole cause of action alleges that TJX used pixels to "knowingly procure[]" her "communication service records" without her consent in violation of the Arizona Act. She purports to bring clams on behalf of allegedly similarly situated Arizona residents.

### B. Arizona Telephone, Utility and Communication Service Records Act

The intent and purpose of the Arizona Act was to outlaw "pretexting"—calling telephone companies to surreptitiously obtain a particular account holder's records by pretending to be that account holder, for which such records were then being sold on the internet. *See* AZ H.R. B. Summ., 2006 Reg. Sess. H.B. 2785 (4/24/06) (discussing that "there are over 40 'data broker' companies that . . . have fraudulently gained access to telephone records by posing as the customer, then offering the records for sale on the Internet without the customer's consent or knowledge, a practice known as 'pretexting.'"). To combat this illicit online market, the Arizona Act prohibited any person from procuring telephone records of Arizona residents through fraudulent or deceptive means, and also required telephone companies to establish reasonable procedures to protect against unauthorized disclosure of subscriber records. *Id.*

A year later, the Arizona General Assembly revisited the Arizona Act, noting that the laws of other states and certain federal laws also prohibited pretexting in other contexts besides telephone records. *See* AZ H.R.B. Summ., 2007 Ariz. HB 2726 (2/5/07) (discussing that "[a]t least 15 states have laws that ban pretexting" in various forms and discussing other federal laws prohibiting pretexting in different contexts). The Arizona General Assembly expanded the Arizona Act to include "public utility" records and "communication service" records as protected records. 2007 Ariz. HB 2726 (May 14, 2007).

While Plaintiff pretends that a scandal at Hewlett-Packard, and specifically peripheral testimony regarding email "spyware,"[1] motivated the legislature to amend the Arizona Act, she fails to cite anything from the legislative history in support of her narrative. (*See* Compl. ¶¶ 22-

[1] Pixel technology is **not** the same as the alleged spyware from the HP scandal. Plaintiff tries to analogize the two by claiming that pixels can track whether the email was forwarded or printed, but none of Plaintiff's cited articles suggest that pixels have such capabilities. (*See* articles cited at Compl. ¶ 29 n.50 (noting that "[a]t maximum," pixels can tell when an email was opened, approximate location, and type of device), ¶ 33 n.54 (same); ¶ 23 n.33 (same)).)

28.)[2] As shown above, nothing in the legislative history for the 2007 amendment suggests that it was intended to cover "spyware." Rather, the intent was to prohibit pretexting.

Far from being a "new law," (*id.* ¶ 28), the Act has not been amended since 2007.

## III. <u>PLAINTIFF LACKS ARTICLE III STANDING BECAUSE SHE DOES NOT ALLEGE AN INJURY-IN-FACT</u>

### A. Courts Lack Subject-Matter Jurisdiction When Plaintiffs Fail To Allege Facts Amounting to a Concrete, Particularized Injury

Federal courts have subject-matter jurisdiction over cases and controversies, which exist only when a plaintiff has standing. *E.g.*, *Katz v. Pershing, LLC*, 672 F.3d 64, 71 (1st Cir. 2012). Thus, when a plaintiff lacks standing, the Court should dismiss the action for lack of subject-matter jurisdiction. *Id.* at 80-81 (affirming dismissal for lack of standing when the plaintiff did not allege concrete injury arising from a data breach claim).

To meet her burden of establishing standing, Plaintiff must show, at a minimum, that she "suffered an injury in fact that is concrete, particularized, and actual or imminent." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). A plaintiff who is "not seeking to remedy any harm to herself but instead is merely seeking to ensure a defendant's 'compliance with regulatory law'" fails to satisfy Article III. *Id.* at 2206; *see also id.* at 2204 ("alleging a bare procedural violation" is insufficient on its own). Rather, "[o]nly those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court." *Id.* at 2205. Moreover, legislative bodies cannot circumvent Article III standing requirements by "enact[ing] an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is." *Id.*

[2] Indeed, Plaintiff's own cited articles note that after the HP executives were indicted, the California Attorney General's office stated that the use of alleged spyware was "not linked" to the charges, and rather that the charges were based "on allegations that they used false pretenses to access individuals' phone records"; i.e., pretexting. (*See* article cited by Compl. ¶ 23 n.33.)

### B. Plaintiff's Conclusory Statutory Claim Does Not Establish an Injury-In-Fact

#### 1. Alleging a Mere Statutory Violation Cannot Establish Standing

Plaintiff fails to allege facts amounting to a concrete injury-in-fact sufficient to establish Article III standing. Indeed, the words "injury" and "harm," and derivations thereof, appear nowhere in the Complaint, and the word "damages" appears only in the context of the HP scandal, and the statutory remedy Plaintiff seeks here.

Instead, Plaintiff's alleged injury is purely statutory: that TJX allegedly violated the Arizona Act. Specifically, Plaintiff alleges that TJX (the email sender) violated the Arizona Act by procuring her purported "communication service records." This is a purely procedural violation, divorced from any concrete injury.

Both the Supreme Court and the First Circuit have reaffirmed that this type of allegation cannot confer standing. In *TransUnion*, the Supreme Court distinguished "an injury in law [from] an injury in fact." 141 S. Ct. at 2205. And in *Plazzi v. FedEx Ground Package Sys.*, 252 F.4th 1, 7 (1st Cir. 2022), the First Circuit acknowledged that even if the plaintiffs could establish a statutory violation, "the possibility of a remedy is not alone sufficient to confer standing."

Considering the "communication service records" at issue further shows that Plaintiff alleges no concrete injury-in-fact. Plaintiff does not allege that the pixel recorded any sensitive information like usernames/passwords, credit card information, or any information outside of the TJX emails themselves. Instead, she alleges that TJX collected her email address (which she previously gave to TJX), the email's subject (which TJX already knew since it authored the email), the email application she used, her IP address, and whether and how long she interacted

with the email. (Compl. ¶ 35; *see also id.* ¶¶ 4, 52 (listing same items).)[3] She alleges no facts suggesting that collecting that information harmed her in any concrete way.

### 2. Plaintiff's Reference to Intrusion Upon Seclusion Does Not Suffice to Establish a Concrete Injury

Nor can Plaintiff plug that hole with a vague reference to intrusion upon seclusion. The Supreme Court has acknowledged that certain intangible harms, including intrusion upon seclusion, can support an injury-in-fact. *Spokeo*, 578 U.S. at 340–41. But that acknowledgement came with an important qualifier: intangible harms suffice only if they have a "close relationship to a harm that has traditionally been regarded as providing a basis for lawsuits in . . . American courts." *Id.* at 340–41. A mere reference to that traditional harm cannot suffice. Instead, the court must consider whether the plaintiff has satisfied all elements "essential to liability" of the traditional harm. *TransUnion*, 141 S. Ct. at 2209. *TransUnion* is instructive on this point. There, the Court evaluated a FCRA claim and concluded that although adding inaccurate information to a consumer's credit file is analogous to defamation, there can be no injury if that information is not published, as "[p]ublication is 'essential to liability' in a suit for defamation." *Id.*

Here, Plaintiff cannot meet that standard. She conclusorily alleges, several times, that the pixel "invaded her privacy and intruded upon her seclusion." (*See* Compl. ¶¶ 5, 31, 54.) But she fails to satisfy the elements of a common-law "intrusion upon seclusion" claim: (1) an invasion of "private facts" or affairs that would be "highly offensive to a reasonable person," and (2) a resulting harm or injury. *See, e.g.*, *Spongberg v. Corritore*, No. CV-2016-053998, 2019 Ariz. Super. LEXIS 1174, *29 (Maricopa Super. Ct., June 4, 2019); *Hart v. Seven Resorts*, 190 Ariz. 272, 279 (Az. App. 1997).

[3] While Plaintiff alleges that the pixel could record whether an email was forwarded or printed, she does not claim to have taken such actions, and thus cannot claim any injury from it. *Spokeo*, 578 U.S. at 339; *Katz*, 672 F.3d at 79.

**First Element:** Plaintiff alleges no "private" facts—much less any "highly offensive" invasion of those facts. Plaintiff did not have a reasonable expectation of privacy for any of the information at issue here. Plaintiff's email address and the email's subject line were not private, because TJX had both well before sending the email. And as a matter of law, consumers do not have a reasonable expectation of privacy in an IP address, which is also not a "private affair." *Mixton*, 250 Ariz. 282, 295 (Az. 2021) (concluding that "IP address and subscriber information are not 'private affairs'" under the Arizona Constitution because internet users lack any reasonable expectation of privacy in "such non-content information").[4]

Nor is information about whether Plaintiff opened the email sensitive or private. Numerous courts have considered, and dismissed for lack of standing, other analogous privacy cases involving so-called "tracking" technologies used on the defendant companies' websites. *Cook v. GameStop, Inc.*, No. 2:22-cv-1292, 2023 U.S. Dist. LEXIS 150953 (W.D. Pa. Aug. 28, 2023) is instructive. There, the plaintiff premised his statutory wiretapping claim upon "session replay technology." That technology consists of code that a website owner uses to track a user's interaction with the website, such as the date and time of the visit, the duration of the visit, Plaintiff's IP address, her location at the time of the visit, her browser type, and the operating system on her device. The court held that the plaintiff lacked Article III standing.

In doing so, the court rejected the plaintiff's attempt to analogize her wiretapping claim to common-law privacy claims, because "[t]he requirement of private facts or private affairs in both torts confirms that the nature of the information is *paramount*," and the information allegedly tracked did not "clear this threshold." *Id.* at *11, *12. Instead, the collected information

---

[4] As discussed later, *see* Section IV.D.2, *infra.*, and in addition to IP address, similar information of which Plaintiff complains is likewise non-private in that it is embedded in *all* email communications independent of a "pixel."

was analogous to the commonplace (if not expected) practice of a cashier in a brick-and-mortar store watching a customer walk around the store. *Id.* at *12–13 (citing *Massie v. GM LLC*, No. 21-cv-787, 2022 U.S. Dist. LEXIS 28969, *7 (D. Del. Feb. 17, 2022) ("Plaintiffs do not allege that any of their information collected by the Session Replay software was personal or private within the common law understanding of a privacy right.")).

Similarly, in *Lightoller v. JetBlue Airways Corp.*, No. 23-cv-00361, 2023 U.S. Dist. LEXIS 102158 (S.D. Cal. June 12, 2023), the court dismissed similar "tracking" claims brought under California's wiretapping statute, also for lack of standing. *Id.* at *10. Central to the court's decision was its conclusion that the plaintiff never "allege[d] that she disclosed any personal information when she visited the website." *Id.* The same is true here.

In holding that there was no concrete injury, the courts in *Cook*, *Massie*, and *Lightoller* each distinguished the technology at issue from other cases, in which the plaintiffs had alleged that the defendant's technology: (1) captured personal information of the plaintiff (e.g., usernames, passwords, or credit card information);[5] and/or (2) went beyond recording the user's interactions with the defendant's website and tracked the plaintiff's visits to other websites unconnected with the defendant. *Cook*, 2023 U.S. Dist. LEXIS 150953 at *13-16 (discussing cases); *Massie*, 2022 U.S. Dist. LEXIS 28969 at *8-12 (same); *Lightoller*, 2023 U.S. Dist. LEXIS 102158 at *11-13 (same); *see also Thomas v. Papa Johns Int'l, Inc.*, No. 22-cv-2012, 2024 U.S. Dist. LEXIS 84019, *6–12 (S.D. Cal. May 8, 2024) (reviewing dozens of session-

[5] For clarity, a few courts have found a plausible concrete injury with more-advanced Session Replay systems that could record a plaintiff's communications. *See Emmett v. Delta Air Lines, Inc.*, No. 2:22-cv-1568, 2024 U.S. Dist. LEXIS 97812, *21 (W.D. Pa. June 3, 2024) (plaintiff had Article III standing because Session Replay technology at issue recorded "all website action," including "all of the information input" by the user). Here, however, Plaintiff does not allege that the pixel captured any such information.

replay cases and observing that the type of data collected "pales in comparison" to the data collected in cases where courts have found a plausible invasion of privacy).

Plaintiff's claim here fails under the same analysis. Plaintiff does not allege that TJX procured any private, sensitive, or confidential information, much less that pixel technology constitutes the sort of "highly" offensive conduct needed to state a claim for intrusion upon seclusion.

**Second Element:** And as to the second element, again, Plaintiff identifies no injury. Instead, her only alleged injury is the alleged intrusion upon seclusion itself—a perfect tautology. Her allegations thus fall short of establishing that Plaintiff suffered a concrete injury—that is, one that "*actually* exist[s]." *Spokeo*, 578 U.S. at 340 (emphasis added). The Court should dismiss her Complaint for lack of standing.

## IV. PLAINTIFF FAILS TO STATE A CLAIM

### A. Applicable Standards Under Rule 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Establishing the plausibility of a complaint's allegations is a two-step process. *See id.* at 679. First, a court should "identif[y] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* Then, a court should "assume the[ ] veracity" of "well pleaded factual allegations" and "determine whether they plausibly give rise to an entitlement to relief." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* at 678 (internal citations omitted).

### B. To State a Claim Under the Arizona Act, Plaintiff Must Allege that TJX Procured a Communication Service Record Without Consent

The Arizona Act prohibits companies from "[k]nowingly procur[ing], attempt[ing] to procure, solicit[ing] or conspir[ing] with another to procure a public utility record, a telephone record or communication service record of any resident of this state without the authorization of the customer to whom the record pertains or by fraudulent, deceptive or false means." A.R.S. § 44-1376.01(A)(1). It provides a private right of action to "a customer whose communication service records, telephone records or public utility records were procured, sold or received in violation of this article." A.R.S. § 44-1376.04. Here, Plaintiff premises her claim upon an alleged procurement of a "communication service record" ("**CSR**").

Thus, to succeed on her claim, Plaintiff must allege that: (1) TJX knowingly procured or attempted to procure; (2) a CSR; and (3) without authorization or through fraudulent, deceptive, or false means. A.R.S. § 44-1376.01(A)(1).

### C. The Arizona Act Does Not Apply Because this Case Does Not Involve a Communication Service Provider

Plaintiff's Complaint fails from the jump because it does not allege that TJX provides a "communication <u>service</u>," such as caller identification or voicemail service. The plain language of the statute, its legislative history, and similarly worded statutes all show that the Arizona Act is intended to protect records regarding types of services provided to consumers, as opposed to a merchant's records interacting with its own customers. And because the Complaint does not allege that TJX provides a communication service, it fails to plausibly allege that the information that pixels collect are <u>communication service</u> records.

**1. The Arizona Act's Plain Text Shows That it Applies Only to Communication Service Providers**

The statute's plain language shows that it pertains not merely to records of communications, as Plaintiff evidently believes, but rather to records maintained by communication service providers. The definition of "communication service record" shows as much:

> [1] subscriber information, including name, billing or installation address, length of service, payment method, telephone number, electronic account identification and associated screen names, [2] toll bills or access logs, [3] records of the path of an electronic communication between the point of origin and the point of delivery and [4] the nature of the communication service provided, such as caller identification, automatic number identification, voice mail, electronic mail, paging or other service features. Communication service records do not include the content of any stored oral, wire or electronic communication or a telephone record.

A.R.S. § 44-1376(1) (numbers added for clarity). That definition includes various types of records that only a provider of communication services would maintain, like the "billing or installation address" of a "subscriber." And the definition expressly notes that CSRs are records that describe "the nature of the communication service *provided*" to the subscriber.

The statute's parallel provisions further evidence the legislature's focus on providers of various services. It applies not only to "communication service records," but also to "public utility records" and "telephone records." *See* A.R.S. § 44-1376(1). A "telephone record," of course, is a record of a telephone company regarding a customer's telephone service. A.R.S. § 1376(7). It would not include information that a consumer's smartphone stores about that consumer's past calls, or information about an auto repair shop's calls to customers. And a "public utility record" is a record of a public utility regarding a customer's public utility service. A.R.S. § 1367(4). To ensure consistency, the Court should construe "communication service record" as limited to records maintained by a communication service provider. *Cf. State v.*

*Mixton*, 250 Ariz. 282, 284–85 (Az. 2021) (holding that "subscriber information" as used in the parallel Arizona ECA means information in the possession of an internet service provider).

TJX is not, nor is alleged to be, a communication service provider, such that the information allegedly collected by the pixel is not a CSR. Nor does Plaintiff claim to have been a "subscriber" to any "service," such that her "subscriber information" would constitute a CSR. The references to "billing or installation address," "length of service," "toll bills," and "access logs," reinforce this reading, making clear that the law contemplates a communication *service* subscribed to by a customer. Because the data at issue in the present case does not relate to any communication service, the Arizona Act does not apply.

Plaintiff's construction flouts canons of construction, as Plaintiff reads the word "service" out of the definition of CSR, so that the statute would apply to any communication record. *BLK III, LLC v. Skelton*, 252 Ariz. 583, 587 ¶ 7 (Az. App. 2022) ("[E]ach word or phrase of a statute must be given meaning so that no part is rendered void, superfluous, contradictory or insignificant."). The Arizona General Assembly chose not to regulate "communication records." Instead, it chose to regulate "communication *service* records."[6]

### 2. The Arizona Act's Legislative History Reinforces That Reading

The plain meaning of the statute is also consistent with its legislative history, which makes clear the law is intended to address pretexting: a person contacting a business pretending to be an account holder to obtain the account holder's records. (*See* Section II.B., *supra*.). *See Gila River Indian Cmty. v. Dep't of Child Safety*, 238 Ariz. 531, 534 (Ariz. Ct. App. 2015) ("[T]he question before us is one of first impression under Arizona law. … We therefore find

---

[6] Plaintiff's proposed definition also violates the canon against superfluity in another way: it would render the separate statutory delineation of "telephone records" superfluous. After all, if any information regarding a communication—even just a person's name—amounted to a CSR, then telephone records qualify as CSRs, rendering the separate statutory category of "telephone records" unnecessary.

instructive the legislative history of ICWA”). Just as the Arizona Act originally prohibited a telephone company from producing telephone records without authorization, the 2007 amendment prohibited a communication service from producing CSRs without authorization.

**3. Related, Similar Arizona and Federal Statutes Confirm that the Arizona Act Applies Only To Communication Service Providers**

Related privacy statutes further reinforce this reading of the Arizona Act, as those statutes also regulate CSRs. Arizona courts construe statutes “in conjunction with other statutes” to promote a “harmonious and consistent” reading “as though they constituted one law.” *State v. Santillanes*, 541 P.3d 1150, 1154-55 (Az. 2024) (“[A] statute.”).

First, the Arizona Eavesdropping and Communication Act, A.R.S. § 13-3001, *et seq.* (“**ECA**”), shows that the Arizona Act applies only to communication service providers. The legislature enacted the ECA in 1995 to achieve two aims. *See* 1995 Ariz. HB 2290. First, the ECA prohibits intercepting the contents of electronic communications. A.R.S. §§ 13-3005, 13-3006. Second, the ECA governs when CSRs may be disclosed to law enforcement. A.R.S. § 13-3018. The ECA is clear that a CSR is specifically a record “used and kept by the communication service provider,” *id.*, defined to mean “any person who is engaged in providing a service that allows its users to send or receive oral, wire or electronic communications or computer services.” A.R.S. § 13-3001(3). The Arizona Act’s definition of a CSR is *identical* to the earlier enacted ECA, A.R.S. § 13-3018(G), making clear in context that a CSR is a record of a communication service *provider*.

Second, the federal Stored Communications Act, 18 U.S.C. § 2307 (“**SCA**”), bolsters this conclusion. The SCA served as a model for the ECA. *See United States v. Williams*, No. 18-CR-01695, 2022 U.S. Dist. LEXIS 121948, *36 (D. Ariz. July 8, 2022) (noting that the ECA is the “Arizona equivalent” to the SCA). “Since the enactment of the SCA,” courts have uniformly

concluded that electronic "communication services" are the "providers" of an underlying communication service, such as "internet service providers" and "e-mail service providers." *In re Michaels Stores Pin Pad Litig.*, 830 F. Supp. 2d 518, 523–24 (N.D. Ill. 2011) (collecting cases and holding that the defendant was not subject to the SCA) (emphasis added); *see also*, *e.g.*, *Fred Hall Shows v. Hall*, No. 21-cv-417, 2021 U.S. Dist. LEXIS 151049, *19–20 (C.D. Cal. July 28, 2021) (finding that the defendant was not a communication service under the SCA when it was not an email or internet service provider). In other words, a CSR is a record of an internet service provider, email provider (*e.g.*, Gmail or Yahoo), or other entities that provide communication services.

Here, it would not have made sense for the legislature to adopt the same terms from these other related privacy statutes but given them different meanings.

### D. The Categories of Information at Issue Fall Outside the Act for Additional Reasons

#### 1. TJX Cannot "Procure" Information it Already Had

TJX could not have violated the Arizona law by allegedly using the pixel to procure her email address or the mail's subject line, because TJX already had both.

The Arizona Act provides that a person shall not "knowingly procure [or] attempt to procure" a communication service record. A.R.S. § 44-1376.01(A)(1). To "procure" means "[t]o obtain." BLACK'S LAW DICT. (11th ed. 2019), *procure*. One cannot "procure" something that one already has. Here, Plaintiff voluntarily provided her email address to TJX so that TJX would send her emails. (Compl. ¶¶ 3, 8). She necessarily expected TJX to have her email address, and to know what it was sending her. Likewise, TJX inherently knows the subject of the emails by virtue of authoring the emails. TJX could not have "procured" Plaintiff's email address or the subject of the emails via the alleged pixel.

**2. Email address, subject of the email, IP address, and email client type cannot reasonably constitute a communication service record without making essentially all email to Arizona residents illegal, nor is there a cognizable privacy interest in this information**

In addition to the email address and subject of the email, Plaintiff also complains that the pixel obtains the recipient's location (through IP address) and what kind of email server the recipient uses. (Compl. ¶¶ 4, 35.) In doing so, Plaintiff either does not understand how email works, or seeks to outlaw email to Arizona residents altogether.

Every email that is sent or received generates a concurrent record known as "internet header" information. This is not a nefarious, sneaky, or optional practice—it is necessary for email to function. As such, all emails, regardless of the sender, generate this data.

Like the pixel of which Plaintiff complains, an "email header is a hidden snippet of code in an email that contains detailed information about the sender, the recipient, and how the message was routed and authenticated." Proton.me, *What are email headers?* (last accessed June 10, 2024). In relevant part, email header information contains the: (1) email address of the sender and recipient; (2) subject line of the email; (3) path of transmission from the outgoing mail server to the destination mail server; and (4) email client type. *See id.*; *see also, e.g., Hagar v. FBI*, No. 1:22-cv-101, 2024 U.S. Dist. LEXIS 56337, *13-14 (E.D. Tex. March 7, 2024) ("[H]eader information within an email is metadata that essentially provides a map of the path the email followed as it travelled (sic) through various mail servers, including times, sender, receiver, devices, and more. This metadata is automatically electronically generated when the email is created and sent."); *United States v. Saville*, No. 12-cr-2, 2013 U.S. Dist. LEXIS 89281, *13–14 (D. Mont. May 20, 2013) ("[An email] packet header contains all of the routing and signaling information associated with a particular communication, including such things as the source and

destination IP addresses, MAC addresses, transmission control protocol, and size of the entire packet in bytes.”).

Even if the Court concludes that the Arizona Act could apply here, it must construe the statute to avoid the absurd result of making it essentially illegal to email Arizona residents, as the internet headers of *all* emails would meet Plaintiff's definition of a CSR. *See Ariz. Health Care Cost Containment Sys. v. Bentley*, 187 Ariz. 229, 233 (Az. App. 1996) (“Statutes must be given a sensible construction that accomplishes the legislative intent and which avoids absurd results.”).

Perhaps the reason why such items are omitted from the definition of a CSR in the first place, as discussed earlier, (*see* Section III.B), is that this is not the type of information in which Arizona residents have any privacy interest. Information like a person's IP address is assigned by an internet service provider, and “[c]onsequently, a user does not control nor own an IP address.” *See Mixton*, 250 Ariz. at 284.[7] While the Arizona Supreme Court in *Mixton* was specifically discussing IP addresses, its reasoning applies with equal force to other information contained in the internet header information of email, as it likewise is included in “every ‘envelope’ of information exchanged back and forth by computers that are actively communicating with each other over the internet.” *See id.*

---

[7] For that matter, while Plaintiff equates IP address with “location,” IP addresses are not precise but only give “approximate geographical location.” *Mixton*, 250 Ariz. at 288; *see also* TheDailyVPN, Does IP address show exact location (last accessed June 7, 2024) (“IP address can only tell your geolocation, not your precise location. It can be hundreds of miles away from your location. It's almost impossible to find the exact location from an IP address.). That Plaintiff resides in Vail, Arizona, is not a “private fact” given that she expressly alleges as much in her Complaint. (Compl. ¶ 7.).

### 3. Post-Transmission Activities Do Not Meet the Definition of a CSR and/or Do Not Apply to Plaintiff

Finally, Plaintiff alleges that the pixel constitutes a CSR because it allegedly reported whether Plaintiff opened and read the email she asked to receive, whether the email was forwarded or printed. (Compl. ¶ 35).

Plaintiff's claim fails as to any printing or forwarding, because she does not claim to have taken either action. Thus, even assuming this information would be considered a CSR, she does not plausibly allege that TJX "procured" any such information.

Regardless, even accepting Plaintiff's proposed definition as covering any record of any communication, a CSR would not include information about open rates and clicks, because such data is not created until *after* any communication occurs. *See* A.R.S. § 44-1376(1). Nothing in the Arizona Act or otherwise suggests that a CSR encompasses information regarding how a person subsequently *interacts* with an email after transmission, rather than the record of the communication itself. *Galvin v. U.S. Bank*, N.A., 852 F.3d 146 (1st Cir. 2017) ("Courts interpret a statute in accordance with its plain words. They may not add words to a statute that the Legislature did not put there.") (citation omitted).

The ECA and SCA are again instructive, as they distinguish between the contents of a communication and a record of the communication and provide insight as to the latter's meaning. *See City and County of San Francisco v. HomeAway.com, Inc.*, 21 Cal. App. 5th 1116, 1127 (Cal. App. 1st Dist. 2018). Just as the Arizona Acts's definition of a CSR requires "the path of an electronic communication [to be] between the point of origin and the point of delivery," A.R.S. § 44-1376(1), courts interpreting the SCA found that while "there is no specific statutory definition for 'record,'" a record is the non-content "information regarding the characteristics of the

message that is generated *in the course of the communication*." *Graf v. Zynga Game Network, Inc.*, 750 F.3d 1098, 1104, 1107 (9th Cir. 2014) (emphasis added).

Thus, even if the information allegedly collected by the pixel constitutes a CSR—and for all of the reasons above, it does not—*post-communication* activities are not records of the communication, much less communication *service* records. The Arizona Act does not apply to this data.

## V. CONCLUSION

For all of the reasons above, TJX's Motion should be granted. Plaintiff lacks Article III standing because she has suffered no injury-in-fact. Even if Plaintiff had standing, she fails to state a claim for relief under the Arizona Act as the information the pixel allegedly collected is not a communication service record. And even if the Court concludes that the Arizona Act could apply here, Plaintiff's interpretation remains overly broad by sweeping in non-private information such as the recipient's email address and similar information that is contained in *every* email separate from a pixel, nor does a CSR include records of post-communication events such as how a person interacts with an email.

Dated: June 28, 2024

BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP

By: */s/ Stephanie Sheridan*

Stephanie Sheridan, (CA 135910)
Meegan B. Brooks (CA 298570)
100 Pine Street, Suite 3100
San Francisco, California 94111
Telephone: 628.600.2250
ssheridan@beneschlaw.com
mbrooks@beneschlaw.com
[*Pro Hac Vice* motions to be filed]

*/s/ David M. Krueger*

David M. Krueger (OH 0085072)
127 Public Sq., Ste. 4900
Cleveland, Ohio 44114
Telephone: 216.363.4500
dkrueger@beneschlaw.com
*[Pro Hac Vice* motion to be filed]

*/s/ Daniel R. Sonneborn*

Daniel R. Sonneborn (BBO# 679229)
DSonneborn@preti.com
Preti Flaherty Beliveau & Pachios LLP
60 State Street, Suite 1100
Boston, MA 02109
Tel. (617) 226-3800

*Attorneys for Defendant TJX Companies, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

Dated: June 28, 2024

By: */s/ Daniel R. Sonneborn*
Daniel R. Sonneborn, BBO# 679229)