IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARLETTE CAMPOS, individually and on behalf of all others similar situated, )<br>)<br>Plaintiff, )<br>)<br>-vs- )<br>)<br>TJX Companies, Inc., )<br>)<br>Defendant. ) | Case No.  1:24-cv-11067-ADB<br><br>**DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS** |

**I.      INTRODUCTION AND SUMMARY OF ARGUMENT**

Plaintiff's Opposition offers no support for finding a privacy interest in the fact that she opened or read emails *she asked to receive*, where *no private information* was gathered, and where *nothing was allegedly disclosed* to a third party. Instead, Plaintiff relies on inapposite statutes and cases involving unsolicited robocalls tying up peoples' phone lines, and the collection or disclosure of highly sensitive information (e.g., fingerprints, retinal scans, or even video footage of people undressing). These authorities are inapposite in the present case, which involves the online analog of a retail store employee observing that a customer stopped to read an advertisement in-store. Plaintiff was not injured, and lacks standing, so her Complaint must be dismissed.

Even if Plaintiff could overcome the standing hurdle (which she cannot), her claim still fails on the merits. The Arizona Act does not apply to alleged tracking in marketing emails—instead, it is focused on "communication service records" ("**CSR**"), i.e., "records" of "communication services" like call forwarding and voicemail services.  Plaintiff's Opposition does not identify a single reference *anywhere* in the law's legislative history that suggests that it is intended to cover the practices alleged here. As TJX is not a communication service, the information allegedly collected by the pixel cannot be a CSR, and her claim must be dismissed.

1

## II.     PLAINTIFF LACKS STANDING

This Court should follow the well-reasoned, published decision in *Hartley v. Urb. Outfitters, Inc.*, No. 23-cv-4891, --- F.Supp.3d ----, 2024 U.S. Dist. LEXIS 125671 (E.D. Pa. July 17, 2024), where the Eastern District of Pennsylvania recently dismissed a virtually identical case for lack of Article III standing. There, the Court rejected all the same arguments advanced in Plaintiff's Opposition, and held:

> As a matter of law, the Court concludes that digital records reflecting merely the dates and times at which Plaintiff opened promotional emails she signed up to receive, and the length of time she spent reading them, are not sufficiently personal to support a concrete injury. Like a users' keystrokes and mouse clicks upon voluntarily visiting a retailers' website, these details are entitled to less privacy protection by virtue of Plaintiff's decision to opt into receiving and reading the emails.

*Id.* at *16. Plaintiff does not even attempt to distinguish *Hartley*, which is on all fours with the present case. This Court should follow *Hartley* and dismiss the Complaint for lack of standing.

### A.     The Court Should Disregard Plaintiff's Strained Analogies to Readily Distinguishable Common Law Claims and Statutory Schemes

The Supreme Court's instruction on standing is clear: "Article III standing requires a concrete injury even in the context of a statutory violation." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021). "[C]ourts should take care not to 'loosen Article III based on contemporary, evolving beliefs about what kinds of suits should be heard in federal courts.'" *Hartley*, 2024 U.S. Dist. LEXIS 125671 at *7 (quoting *Ramirez*, 594 U.S. at 424-25).[1]

While Plaintiff's Opposition highlights superficial commonalities between her claim and the tort of intrusion upon seclusion, it overlooks the most important inquiry: whether "'the *harm* [she] suffered as a result of the statutory violation bears a sufficiently close relationship to the

---

[1] The opinions of bloggers (so-called "privacy experts"), (*see* Opp. at § I.A.), should not impact "what kinds of suits should be heard in federal courts." *See Ramirez*, 594 U.S. at 424-25.

2

*harm* from that common-law action.'" *Hartley*, 2024 U.S. Dist. LEXIS 125671 at *8 (emphasis added) (citation omitted). Plaintiff's alleged harm here is nothing like those in traditional invasion of privacy cases—it involves a non-offensive and ubiquitous practice; information voluntarily shared by Plaintiff to receive emails that she routinely read; no dissemination of the data to third parties; and no private facts. *See, e.g.*, *Cook v. GameStop, Inc.*, 689 F. Supp. 3d 58 (W.D. Pa. 2023) ("The requirement of private facts or private affairs in both torts confirms that the nature of the information is paramount. … [and] communications that do not involve personal information … or information over which a party has a reasonable expectation of privacy does not amount to a concrete injury."). The *Hartley* court found especially telling that the plaintiff did not claim that the defendant ever disseminated the data at issue: "while some statutes intended to protect individuals' private information do not require a disclosure to a third party (as is true of the Arizona Records Act here), the Supreme Court and Third Circuit caution against finding a concrete harm when there is no actual dissemination, even if that information is protected by statute." *Hartley*, 2024 U.S. Dist. LEXIS 125671 at *10-11 (citing *Kamal v. J. Crew Grp., Inc.*, 918 F.3d 102 (3d Cir. 2019)). The First Circuit agrees. *See Amrhein v. eClinicalWorks, LLC*, 954 F.3d 328, 334 n.5 (1st Cir. 2020) (citing *Kamal* favorably for the same proposition).

Plaintiff also fails to identify any other statutory scheme that is analogous to the Arizona Act. Each of the statutes cited in the Opposition (Opp. at § I.B., pp. 10-13) contemplate concrete harms that Plaintiff has not alleged here:

- The Telephone Consumer Protection Act, 47 U.S.C. § 227 ("**TCPA**") is designed to prevent the "annoyance" and "wasted time" from "unwanted robocalls" tying up phone lines and wasted paper/toner from faxes—injuries with no relevance here. *See, e.g.*, *Douglas Phillip Brust, D.C., P.C. v. Opensided MRI of St. Louis LLC*, 343

> F.R.D. 581, 590 (E.D. Mo. 2023). And here, unlike in TCPA cases, Plaintiff "not only opted in to receiving emails from Defendant by joining its subscriber list, but continued to consume its promotional materials by regularly opening them." *Hartley*, 2024 U.S. Dist. LEXIS 125671 at *13.

- The sensitive biometric information protected by the Illinois Biometric Information Privacy Act, 740 ILCS 14—such as a person's retina scan, fingerprints, voiceprints—is readily distinguishable from the information at issue here: i.e., that opened an email that she asked to receive.

- The Video Privacy Protection Act ("**VPPA**") "prohibits only the wrongful *disclosure* of video tape rental and sale records by service providers to others," and the allegations involving a pixel are not comparable "to other tracking-pixel cases involving third-party disclosures." *Hartley*, 2024 U.S. Dist. LEXIS 125671 at *10. Moreover, the VPPA protects "private video viewing activity—a category of information materially different from data relating to promotional emails which subscribers opt in to receive." *Id.* at *10 n.59.[2]

For similar reasons, *Lawlor v. N. Am. Corp. of Illinois*, 983 N.E.2d 414. 418-20 (IL 2012) and *Miller v. Brooks*, 472 S.E.2d 350, 352-53 (N.C. App. 1996) are distinguishable. *Lawlor* did not involve simply "obtaining phone call records" as Plaintiff states, but rather involved a private investigator obtaining private, non-public phone records by deceptively pretending to be the plaintiff, i.e., **pretexting**, which is *not* what Plaintiff alleges was done in this case. *Miller*, in turn, did not involve simply "intercepting and sorting mail," as Plaintiff states, but rather involved an

---

[2] The Michigan statute at issue in *Pratt v. KSE Sportsman Media, Inc.*, 586 F. Supp. 3d 666 (E.D. Mich. 2022) (cited in Opp. at 16) was based on the VPPA and is distinguishable on the same grounds. In *Pratt*, the defendant allegedly sold the plaintiff's reading information "to several data miners" leading to "aggressive" advertising from various third parties. *Id.* at 668.

estranged wife who installed video cameras recording her husband undressing, showering, and going to bed, as well as intercepting and discarding his mail. These cases further underscore the differences between cases where courts have found Article III standing, and Plaintiff's claims here.

> **B.   There is No Concrete Harm When a Technology Collects Basic, Non-Sensitive Information and There Are No Allegations of Third-Party Disclosure**

Although Plaintiff attempts to distinguish decisions finding a lack of standing in cases involving session replay and similar online tracking technologies, (Opp. at § I.C., pp. 13-16), such cases are far more instructive than those proffered by Plaintiff. *See Hartley*, 2024 U.S. Dist. LEXIS 125671 at *15 (analogizing similar session replay cases). Plaintiff does not respond to the vast majority of these cases.

Plaintiff claims that *Cook v. GameStop, Inc.*, 689 F. Supp. 3d 58 (W.D. Pa. 2023), was subsequently "criticized" by *Emmett v. Delta Air Lines, Inc.*, No. 2:22-cv-1568, 2024 U.S. Dist. LEXIS 97812 (W.D. Pa. June 3, 2024). (Opp. at 13.) But as TJX explained in it motion, (Mot. at 10 n.5), the technology in *Emmett* was more advanced than that in *Cook* (and other internet tracking cases finding no standing)—and at issue here—in that it was not only capable of recording communications generally, but also specifically involved "credit card details and other sensitive information … [that were] recorded and stored for Defendant to access." *Emmett*, 2024 U.S. Dist. LEXIS 97812 at *24, 28-29; *see also Cook*, 689 F. Supp. 3d at 65-67 ("Perhaps more notable than what [the plaintiff] allegedly did on GameStop's website is what she did ***not*** do," and discussing lack of private of sensitive information allegedly collected) (emphasis in original).

Similarly, while Plaintiff cites some cases that have distinguished *Lightoller v. JetBlue Airways Corp.*, No. 23-cv-00361, 2023 U.S. Dist. LEXIS 102158 (S.D. Cal. June 12, 2023), (Opp.

5

at 14), on the facts, those cases involved more sophisticated technologies or the interception of data by third parties—neither of which is relevant here.[3]

Ultimately, while Plaintiff attempts to paint decisions like *Cook* and *Lightoller* as outliers, they are consistent with the multitude of other cases cited by TJX but ignored in the Opposition. Where, like here, no private or personal information is allegedly obtained, courts overwhelmingly find a lack of concrete injury. *See generally Thomas v. Papa Johns Int'l, Inc.*, No. 22-cv-2012, 2024 U.S. Dist. LEXIS 84019, *6–12 (S.D. Cal. May 8, 2024) (cataloging the "numerous cases filed in federal courts around the country challenging the use of Session Replay Code" and observing that the type of data collected "pales in comparison" to the data collected in cases where courts have found a plausible invasion of privacy).

    **C.    The Court Should Engage in the Same Harm-By-Harm Analysis as *Hartley* and Reach the Same Conclusion**

As the only case to date to involve alleged violations of the Arizona Act, involving pixels in email marketing, *Hartley* draws a persuasive roadmap for dismissing the present case. Plaintiff does not even try to distinguish it. Instead, Plaintiff argues that *Hartley* was wrongfully decided because while the plaintiff "may have signed up to receive emails," she never consented to the defendant "spying" on her. (Opp. at 15.) The Court should reject this red herring argument. The court in *Hartley* made clear that the fact that the plaintiff signed up for the emails by itself was not

---

[3] In *D'Angelo v. FCA US*, No. 3:23-cv-00982, 2024 U.S. Dist. LEXIS 70298, *3-5 (S.D. Cal. Mar. 28, 2024) and *Garcia v. Build.com, Inc.*, No. 22-cv-01985, 2023 U.S. Dist. LEXIS 121085, *2 (S.D. Cal. July 13, 2023), both plaintiffs alleged that the defendants secretly recorded their conversations in violation of California's two-party consent requirement and shared them with a third party. And in *James v. Walt Disney Co.*, 23-cv-02500, 2023 U.S. Dist. LEXIS 200997 (N.D. Cal. Nov. 8, 2023), the court *agreed* that "a privacy claim is dependent on personal information being implicated," and cited *Lightholler* and *Massie* favorably for this proposition, but found that the plaintiff had "made allegations that the information collected was more" than in those cases, particularly when that information was also allegedly shared with a third party. *Id.* at *3-4, 13,18. The court in *James* did disagree with *Lightoller* regarding whether any non-anonymized information represented an invasion of privacy when that information was tracked by a third party. *Id.* at *14, 19-20. But Plaintiff raises no such allegations in this case, so the "disagreement" between *James* and *Lightoller* on that point is a red herring here.

determinative. 2024 U.S. Dist. LEXIS 125671 at *14 ("This is not to suggest that consumers, by signing up to join an email subscriber list, thereby grant permission for retailers to surreptitiously gather everything under the sun," then citing examples). Instead, the court concluded that the analysis "must center on each of the specific categories of data alleged to have been gathered." *Id*. An alleged harm-by-harm analysis here compels the same outcome as in *Hartley*.

As in *Hartley*, Plaintiff first alleges that the pixel "procured" her email address and the subject of the email. (Compl. ¶ 35.) But "[a]s a willing subscriber," Plaintiff's email address was a detail she voluntarily "provided to Defendant when she signed up for its promotional emails." *Hartley*, 2024 U.S. Dist. LEXIS 125671 at *14. Likewise, she could not have been "harmed" by TJX knowing the subject line of emails that TJX drafted itself.

Plaintiff next complains that the pixel obtained her "location" through her IP address. (Compl. ¶¶ 35, 52.) The court in *Hartley* found this a "closer" question but held that "allegations of what a technology is merely capable of collecting do not equate to sufficient allegations of what that technology actually collected," particularly where the plaintiff alleged nothing regarding the data's granularity. *Id*. at *16. And while TJX agrees with the court's conclusion, TJX respectfully does not believe it is not a closer question.

The Arizona Supreme Court has held that there is *no* expectation of privacy in an IP address. *State v. Mixton*, 250 Ariz. 282, 295 (Az. 2021). Because an IP address (1) is not personal in nature but is assigned by an internet service provider, and (2) is disclosed to every computer to which a device connects when on the internet, "[t]he *unanimous* federal court authority" finds that there is "no privacy interest in IP addresses." *Id.* at 294; *see also id.* at 284 (noting that IP addresses provide only an "approximate geographic location," undermining any claim to a privacy interest); *United States v. Morel*, 922 F.3d 1, 9 (1st Cir. 2019) (holding that the defendant "did not have a

reasonable expectation of privacy in [his] IP address"); *accord United States v. Mitrovich*, 95 F.4th 1064, 1068 (7th Cir. 2024) ("[A] person has no reasonable expectation of privacy in their IP address because they voluntarily share it with third parties while browsing the internet.").

As to the type of "email server" a person uses, (Comp. ¶ 52), *Hartley* found that not only did the plaintiff fail to explain any harm from the defendant learning that information, but that such "details are not comparable to those traditionally contemplated as giving rise to a reasonable privacy interest." 2024 U.S. Dist. LEXIS 125671 at *14-15. Regardless, Plaintiff already provided that information when she gave her email address to TJX. For example, if a consumer provides a Gmail address, then she also inherently shares that her email uses a Google server. She suffers no harm from a pixel allegedly "collecting" information that is evident from the email address itself.

The only remaining substantive allegation is that TJX knew whether Plaintiff opened the email and how long she spent reading it. *Cook* considered whether using session replay technology to record more-detailed information (the specific products a user viewed) gave rise to concrete harm and concluded that it did not:

> This information is no different from what GameStop employees would have been able to observe if Ms. Cook had gone into a brick-and mortar store and began browsing the inventory. Her physical movements in the store are like her mouse movements, her pauses to look at inventory are like her mouse pointer hovering over products, and her picking up video games off the shelf are like placing those same titles in her virtual cart. Ms. Cook certainly doesn't have a reasonable expectation of privacy in this kind of public shopping behavior in the physical world, and she doesn't have it in the digital world, either.

*Cook*, 689 F. Supp. 3d at 66.

That analogy holds here. Using a pixel to determine whether Plaintiff opened a solicited promotional email and how long she spent reading it is no different than if a TJX employee observed Plaintiff in a TJX store stopping to read posted advertisements and monitoring how long she spent reading them. "[D]igital records reflecting merely the dates and times at which Plaintiff

opened promotional emails she signed up to receive, and the length of time she spent reading them, are not sufficiently personal to support a concrete injury." *Hartley*, 2024 U.S. Dist. LEXIS 125671 at \*16. "Like a users' keystrokes and mouse clicks upon voluntarily visiting a retailers' website, these details are entitled to less privacy protection by virtue of Plaintiff's decision to opt into receiving and reading the emails." *Id.*

Finally, Plaintiff concedes that she did not forward or print any of the emails but claims that there is an invasion of privacy regardless of "whether Plaintiff did or did not take such actions" because TJX would know that she did not forward or print the email. (Opp. at 7 n.1.) But that still does not identify or explain any supposed *harm*. Knowing that Plaintiff did "not" forward an email is no different than knowing that Plaintiff did "not" visit different parts of a website, or a store employee observing that Plaintiff did "not" take any action after viewing an in-store advertisement.

Plaintiff has not provided this Court with a single case—from this jurisdiction or elsewhere—supporting the contention that tracking when an email, that Plaintiff requested, was opened constitutes an intrusion upon seclusion. Nor has she even attempted to explain how this is any different than a store employee observing when a customer enters, browses, and leaves a store.

**D.   Plaintiff Alleges No Harm**

Even if the Arizona Act were intended to prohibit email pixels—and it was not—a statute cannot "transform something that is not remotely harmful into something that is" for purposes of Article III standing. *Ramirez*, 594 U.S. at 426. And even if the information collected by the pixel *could* theoretically lead to some concrete harm, Plaintiff's Complaint alleges none. Instead, Plaintiff simply concludes that because the Arizona Act "was passed to protect Arizona residents against [] invasions of privacy," and because she alleges that Arizona Act was violated, this

inherently means that she has "alleged sufficient harm rising to 'concrete injury.'" (*See* Opp. at 11.) But "an injury in law is not an injury in fact." *Ramirez*, 594 U.S. at 427.

"[P]laintiff has not suffered any physical, monetary, or cognizable intangible harm traditionally recognized as providing a basis for a lawsuit in American courts," *id.*, so she cannot establish Article III standing. Her claims must be dismissed.

### III.     PLAINTIFF'S CLAIM FAILS ON THE MERITS

#### A.     TJX Is Not a Communication Service and the Information Allegedly Collected by the Pixel Therefore Cannot Be a Communication Service Record

TJX is not a "communication service," and Plaintiff does not argue otherwise. That puts an end to her claim under the Arizona Act, which in relevant part applies only to CSRs.

##### i.     Plaintiff Cites No Support for her Argument that the Arizona Act was Amended to Address "Email Spyware"

Plaintiff's primary argument continues to be that the Arizona Act was amended to cover CSRs to address so-called email "spyware." While Plaintiff makes much of the fact that the HP scandal happened to peripherally involve emails, the focus of the scandal was pretexting—the fact that investigators hired by HP's chairwoman had impersonated HP board members and journalists to obtain their phone records.

TJX's argument is not that the amendment "was not intended to add anything," as Plaintiff argues. (Opp. at 17.) It is that the amendment had nothing to do with "email spyware," which is not mentioned *anywhere* in the legislative history for the amendment.

##### ii.     The Court Should Not Read "Service" Out of "Communication Service Record"

Plaintiff asks the Court to ignore the word "service" in "communication service record," arguing that the legislature "could have used any term" to accommodate the definition. (Opp. at 19.)  However, as Plaintiff's own cited authority goes on to note in the next paragraph, if there is

any ambiguity in a definition, typical principles of statutory interpretation apply, and "[f]ar and away the most important of those is the *contextual* factor *of the word actually being defined*." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 36 (2012) (emphasis added). This is because since "[a]n entirely artificial definition is rare, the meaning of the definition is almost always closely related to the *ordinary meaning of the word being defined*." *Id.* (emphasis added).

Here, the word being defined is "communication service record," which refers to a record from a "communication service," like voicemail and call-forwarding services.[4] By including "service" between "communication" and "record," the statute means something *other than* "communication record." Otherwise, "service" is meaningless. If the Arizona General Assembly meant for any "communication record" to be covered by the statute, it would have simply used that phrase.[5]

### iii.     *Expressio Unius Does Not Apply*

Plaintiff also argues that because the Arizona Act separately defines a "telephone company" as an entity that maintains telephone records, and a "public utility" as an entity that maintains public utilities records, the fact that the Arizona Act does not separately define

---

[4] Indeed, if "service" is irrelevant because it is the term being defined, then "communication" would also be irrelevant. Under that logic, a CSR would include any type of business record regarding a subscriber to a service that includes information like a person's name or billing address, even if the service being subscribed to *had nothing to do with communications*. This, of course, also requires ignoring that the definition itself notes that a CSR is information regarding "the communication service provided" to the subscriber. A.R.S. § 44-1376(1). But that is apparently Plaintiff's position if the phrase "communication service" is meaningless.

[5] Plaintiff also counters that the term telephone record is not superfluous because the definition of a CSR expressly excludes telephone records. (Opp. at 20.) This argument, perhaps intentionally, misses the point. If Plaintiff's interpretation were valid, there would not be any need to *distinguish* between telephone records and a CSR, and the Arizona Act could simply have regulated "communication records" in full. The fact that the CSR definition expressly excludes telephone records from its scope supports that the Arizona General Assembly was purposefully distinguishing telephone companies from *other communication services*, i.e., the act is intended to separately define and protect discrete categories of records by these providers, rather than "communication records" from just any entity.

"communication service" means that the definition of a CSR should be entitled to broader construction under the doctrine of *expressio unius est exclusio alterius*. (Opp. at 19.)[6]

"Virtually all the authorities who discuss the [*expressio unius*] canon emphasize that it must be applied with great caution, since its application depends so much on context." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 10 (2012); *see In re Riggins*, 544 P.3d 64, 69-70 ¶ 30 (Ariz. 2024) ("[T]he *expressio unius* canon should be used with caution"); *see also United States v. Councilman*, 418 F.3d 67, 74 (1st Cir. 2005) ("Like other canons of statutory construction, it is only an aid in the ascertainment of the meaning of the law, and must yield whenever a contrary intention on the part of the lawmaker is apparent." (quoting *Springer v. Gov't of Phil Islands*, 277 U.S. 189, 206 (1928))). Significantly, courts also caution against applying this canon where, as here, the statute's legislative history supports a contrary reading. *See Councilman*, 418 F.3d at 76 (analyzing legislative history when weighed against the invocation of *expressio unius*).

*Expressio unius* may be relevant where two parts of a statutory scheme, enacted at the same time, are otherwise "parallel" in terms of a definition proffered or exclusions listed, such that the existence of language in one provision, and absence of the same language in another identical provision, creates a reasonable inference that the absence in the latter was intentional. *See Councilman*, 418 F.3d at 73-74; *see also Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 48 (1st Cir. 2024). That is not the case here, and TJX is not aware of any decisions applying *expressio unius* in the context of analyzing and making inferences based on the overall structure of a statutory scheme, as Plaintiff tries to apply the doctrine.

---

[6] As importantly, Plaintiff's invocation of the doctrine is a tacit acknowledgment that the Arizona Act's plain text does not support her proffered interpretation. *See Councilman*, 418 F.3d at 73 ("Reliance on a canon of construction to support the inference belies the availability of a plain text argument. Rather, it confirms that the text of the statute is ambiguous with regard to the communications at issue.").

For example, in *Councilman*, the defendant was charged violating the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq.* ("**ECPA**") for intercepting and copying electronic communications. 418 F.3d at 69-71. The defendant argued that the emails were in "electronic storage" at the time of copying, and thus were not "intercepted." *Id.* at 72. The defendant argued that the ECPA expressly prohibited intercepting wire communications in "electronic storage," and because the definition of an electronic communication (at the time of the offense) did not include communications in "electronic storage," *expressio unius* applied. *Id.* at 73. In rejecting this argument, the First Circuit noted that definition of "wire communication" and "electronic communication" were not "parallel" and regulated different substantive conduct, such that *expressio unius* could not be used to draw any inferences as to legislative intent. *Id.* at 74-75.

The same is true here. While there is some overlap, the definition of a telephone record, public utility record, and CSR are not the same. For that matter, while the Arizona Act defines a "telephone record" as a record "[r]etained by a telephone company," it does not specify that a "public utility record" is a record retained by a "public utility," even though it defines both.

Moreover, Plaintiff's invocation of *expressio unius* is subordinate to Arizona's preference that related statutes be construed in *pari materia*, meaning, as a unified whole and in a manner "as though they constituted one law." *State v. Santillanes*, 541 P.3d 1150, 1154-55 (Ariz. 2024); *Mullin v. Raytheon Co.*, 164 F.3d 696, 702 (1st Cir. 1999); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* Appendix B at 430, *in pari materia* ("[S]tatutes *in pari materia* should be construed together, so that ambiguities in one statute may be resolved by looking at another statute on the same subject"). *Expressio unius* "does not override [the court's] obligation to construe a provision of a statute in the context of related provisions and in light of its place in the statutory scheme." *Maricopa Cty. v. Rana*, 461 P.3d 439, 448 ¶ 33 (Ariz. Ct. App.

2020) (citation omitted); *see also State v. Story*, 75 P.3d 137, 141 ¶¶ 13-14 (Ariz. Ct. App. 2003) ("[T]here is no need to resort to a rule of construction such as *expressio unius* because [the statutes], when read together, are not ambiguous").

Plaintiff does not dispute that the definition of a CSR is taken directly from the Arizona ECA and that the statutes are related, nor does she seriously dispute that the information allegedly collected by the pixel would not be a CSR under the Arizona ECA. (*See* Opp. § III.C., pp. 20-21.)[7] The two statutes should therefore be read together, with CSR referencing records from communication services such as call forwarding and voicemail services—and not unrelated practices like alleged email tracking.

Plaintiff's sole argument in response is that the two statutes should not be read together because the Arizona Act does not define a "communication service" like the Arizona ECA. (*Id.*) This argument fails three times over. **First**, the Arizona Act is clear without a separate definition for "communication service," making any such definition unnecessary. Whether it is information regarding the subscriber (name, length of service, etc.), or information regarding the specific service itself, the definition of CSR is built on the notion that a CSR is information that describes "the communication service provided" to the "subscriber" to that service. A.R.S. § 44-1376(1).

**Second**, *expressio unius* is "pretty weak when applied" to statutory schemes enacted at separate times—as the Arizona Act and Arizona ECA were. *See Councilman*, 418 F.3d at 74.

**Third**, the Arizona Act's CSR is directly based on the ECA, and the omission of a single definition does not change the fact that one is inspired by and based on the other, and that the two

---

[7] Plaintiff in passing states that the information allegedly collected by the pixel is still a CSR under TJX's position because it shows when she "accessed" her email. (Opp. at 19.) But that argument does not make sense. If TJX procured Plaintiff's email records *from* Google, that would certainly be subject to the Arizona Act. But Plaintiff makes no such allegation. TJX allegedly creating its *own* record from the pixel is not an allegation that TJX procured her email records from a communication service like Google.

should be read in unison, regardless of any inartful drafting. *See id.* at 74; *see also Smith v. Me. Bureau of Revenue Servs*, 910 F.3d 576, 584 (1st Cir. 2018) ("[W]here it is apparent that a provision deviates from those assumptions about artful drafting, strict application of the canons 'does not seem a particularly useful guide to a fair construction.'") (citation omitted).

### B. Plaintiff's Proposed Interpretation Would Lead to Absurd Results

Plaintiff cannot hide from her broad claim that TJX violated the Arizona Act by allegedly "procuring" her email address and subject line of the email. (*Compare* Compl. ¶ 35 *to* Opp. at 21.) This allegation, if accepted, would make every email marketer liable—even though *Plaintiff* was the reason TJX had her email in the first place, when she signed up for TJX's email list.

Plaintiff's argument as to IP addresses and path of transmission fare no better. While Plaintiff asserts that "[m]illions of emails are sent every day without the use of spy pixels and related trackers," (Opp. at 21), *every* email—regardless of any "trackers"—automatically generates a record regarding the path of transmission from the sender's server to the destination server. (*See* Mot., pp. 16-17; *see generally* Orin S. Kerr, Internet Surveillance Law After the USA Patriot Act: The Big Brother That Isn't, 97 Nw. U. L. Rev. 607, 611-14 (2003) (discussing email headers generated by email transmissions, with example)). The First Circuit explained this technological process of how emails work in *Councilman*. 418 F.3d at 69-70; *see also United States v. Lavabit, LLC*, 749 F.3d 276, 281 n.6 (4th Cir. 2014) ("Metadata, sometimes called envelope information, describes 'the how, when, and where of the message.' It includes 'IP addresses, to-from information on emails, login times, and locations.'") (citation omitted). In short: every email generates a record of the electronic path of the email "between the point of origin and the point of delivery." A.R.S. § 44-1376(1). The Arizona legislature could not have possibly intended to outlaw this practice.

Finally, Plaintiff argues the Arizona Act does not import a "simultaneous transmission" requirement for a CSR. (Opp. at § V., pp. 21-22.) This is true. But TJX's point is that information regarding how a person interacts with an email after delivery—whether it is forwarded, printed, or whatever else—is not a record of the communication itself. Nor does it fall into the category of "subscriber" information.

## IV.    CONCLUSION

This Court should follow *Hartley v. Urb. Outfitters, Inc.*, No. 23-cv-4891, --- F.Supp.3d ----, 2024 U.S. Dist. LEXIS 125671 (E.D. Pa. July 17, 2024) and dismiss Plaintiff's case for lack of standing. In the alternative, Plaintiff fails to state a claim for the reasons herein.

Dated: August 9, 2024

BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP

By: */s/ Stephanie Sheridan*
Stephanie Sheridan, (CA 135910)
Meegan B. Brooks (CA 298570)
100 Pine Street, Suite 3100
San Francisco, California 94111
Telephone:  628.600.2250
ssheridan@beneschlaw.com
mbrooks@beneschlaw.com
[*Pro Hac Vice*]

*/s/ David M. Krueger*
David M. Krueger (OH 0085072)
127 Public Sq., Ste. 4900
Cleveland, Ohio 44114
Telephone: 216.363.4500
dkrueger@beneschlaw.com
*[Pro Hac Vice]*

        */s/ Dan Sonneborn*
        Dan Sonneborn (BBO# 679229)
        DSonneborn@preti.com
        Preti Flaherty Beliveau & Pachios LLP
        60 State Street, Suite 1100
        Boston, MA 02109
        Tel. (617) 226-3800

*Attorneys for Defendant TJX Companies, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

Dated: August 9, 2024

        *By: /s/ David M. Krueger*
        David M. Krueger